LAW OFFICES OF
# GARY G. BECKER, P.L.L.C.
747 THIRD AVENUE · 20TH FLOOR
NEW YORK, NEW YORK 10017

(212) 785-7565

FACSIMILE: (212) 214-0901
becker@garybeckerlaw.com

May 26, 2020

Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

*Re: United States v. Pablo Carrillo-Berber, 18 Cr. 703 (PAC)*

Dear Judge Crotty:

This letter is respectfully submitted on behalf of Pablo Carrillo-Berber in regard to his sentencing, scheduled for June 4, 2020, at 10:30 a.m. Additionally, we enclose a letter to the Court from Mr. Carrillo-Berber accepting full responsibility for his conduct which he deeply regrets. Enclosed as well are letters from Ms. Ines Alvarez Hernandez, his common-law wife of ten years, and from her eighteen-year-old son (Mr. Carrillo-Berber's stepson) Eduardo Jossue Zacarias Alvarez[1], as well as certificates documenting Mr. Carrillo-Berber's successful completion of courses while incarcerated at the Metropolitan Detention Center, in Brooklyn.

## Background

Pablo Carrillo-Berber is a 41-year-old peasant native of a Paracuaro, a small town in the western state of Michoacan, Mexico. Growing up there his life was impoverished in every sense of the word. Pablo lived in abject poverty with his parents and eight siblings in a ramshackle structure that lacked indoor plumbing or electricity. PSR, at ¶42. He attended school only as far as the fourth grade. His father and siblings were itinerant farmers, and when he was just nine, Pablo's father took him out of school and put him to work in the fields, picking tomatoes and other crops from sunrise to sunset for a few dollars a day. *Id.* Mr. Carrillo-Berber's father was an abusive alcoholic prone to fits of rage and violence directed most pointedly at young Pablo and his mother. His repeated abuse left terrible scars on his son, both physical and emotional. The senior Mr. Carrillo-Berber abandoned the family when Pablo was about 13. *Id.*

---

[1] These letters were written in Spanish and translated into English by a Court-certified interpreter.

In the ensuing years, when jobs were available, he worked in the fields, as a mason, and in construction and other trades, eking out meager wages. Mr. Carrillo-Berber has been married (common-law) for ten years to Ms. Alvarez Hernandez, who previously sold clothing for a living but who now works as a domestic cleaning woman in Uruapan, Mexico. Her eighteen-year-old son, Eduardo, has called Mr. Carrillo-Berber father since he was eight when his mother and he became involved. He also enjoys a good relationship with his own son, seventeen-year-old Carlos Carrillo Santos, the product of a brief relationship Mr. Carrillo-Berber had in 2001. *See* PSR, at ¶44. More than once over the years, Mr. Carrillo-Berber crossed the border into the United States without legal authority in search of opportunity for higher pay. He would stay for months at a time, working at odd jobs and as an itinerant hand in the California farm fields, picking grapes and persimmons and then return home with the little money he had saved.

In 2014, Mr. Carrillo-Berber emigrated to the United States for the last time. Living in a small rented room in a basement apartment in Brooklyn, he managed to find steady, lawful employment in the Brooklyn Terminal Fruit and Produce Market. He worked ten to twelve hours a day and made approximately $800 weekly. PSR, at ¶ 58. But he also broke the law. Hoping to make additional money, and worried for his family, Mr. Carrillo-Berber agreed to serve as a messenger, to pick up and deliver two packages belonging to others that he believed contained a controlled substance. He received no compensation for his efforts. On August 2, 2018, while delivering the second package, Mr. Carrillo-Berber was arrested and charged with conspiracy to distribute and possess with intent to distribute more than one kilogram of heroin, in violation of 21 U.S.C. 841(b)(1)(A) and 846. He has been incarcerated at the MDC continuously since then, approximately twenty-two months.

Mr. Carrillo-Berber acknowledged his guilt during questioning following his arrest. PSR, at ¶15. On June 24, 2019, Mr. Carrillo-Berber pleaded guilty to a lesser-included offense of that charged in the Indictment, specifically conspiracy to distribute and possess with intent to distribute a detectable amount of heroin, in violation of 21 U.S.C. §846 and 841(b)(1)(C). As such, Mr. Carrillo-Berber is not subject to a mandatory minimum term of imprisonment. Further, the government has stipulated in the plea agreement that Mr. Carrillo-Berber was a minor participant in the offense conduct, warranting a two-level reduction in his offense level, pursuant to U.S.S.G. §3B1.2(b). Given his undocumented status in the country and his conviction, Mr. Carrillo-Berber is subject to mandatory deportation, An ICE detainer has been filed. *See* PSR, at page 1 and ¶43.

The primary duty of the Court is to impose a sentence consistent with the parsimony principle embodied in 18 U.S.C. §3553(a); namely, that the sentence be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing set forth in that section. In fulfilling that duty, the Court is charged with the "particular trust" of ensuring that "every convicted person [be considered] as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008)(citation omitted).

Mr. Carrillo-Berber's offense conduct was serious, but it is offset by many mitigating factors. These include: (1) Mr. Carrillo-Berber's impoverished background, including a lack of formal education; (2) his minor role in the offense conduct, which itself was of limited duration and did not involve firearms or violence; (3) his spotless disciplinary record and rehabilitation efforts while incarcerated at the MDC; (4) the unusually harsh conditions of his confinement at the MDC owing in part to a prolonged power and heat failure in the winter of 2019 and the current Covid-19 lockdown, now entering its third month; and (5) that certain deportation and lifetime banishment from the United States awaits Mr. Carrillo-Berber (an ICE detainer is in place).

It is respectfully submitted that collectively these mitigating factors provide ample basis for the Court to determine that a sentence of time served is sufficient to satisfy all the goals of sentencing.

**Contrary to the Parties' Understanding When Entering the Plea Agreement, and the Calculations in the Presentence Report, Mr. Carrillo-Berber is In Criminal History Category I and he Qualifies for Safety Valve Relief**

Mr. Carrillo-Berber has one prior criminal conviction, a California state offense for which he was sentenced to a three-year term of imprisonment on April 4, 2002. PSR, at ¶32.[2] In calculating Mr. Carrillo-Berber's criminal history score and sentencing guidelines, the parties counted that term of imprisonment as a "prior sentence" under U.S.S.G. §4A1.1(a). meriting three criminal history points as the sentence length exceeded one year and one month. *Id.* Those points placed Mr. Carrillo-Berber in Criminal History Category II and also disqualified him from eligibility for safety valve relief under amended U.S.S.G. §5C1.2. Consequently, the parties calculated Mr. Carrillo-Berber's adjusted offense level as 25 (base offense level of 30 based on one kilogram or more of heroin; minus two levels for minor role; minus three additional levels for acceptance of responsibility). In Criminal History category II, an offense level of 25 corresponds to an advisory sentencing range of 63 to 78 months imprisonment. The Presentence Report mirrors these calculations. *See* PSR, at ¶¶ 21-33.

Further investigation reveals, however, that the parties were almost certainly in error by according Mr. Carrillo-Berber three criminal history points based on the 2002 California sentence. In fact, given its age, the sentence imposed by the California court April 4, 2002 should not count as a "prior sentence" at all under U.S.S.G. §4A1.1 in Mr. Carrillo-Berber's criminal history score. Although a "prior sentence" is defined generally as "any sentence previously imposed upon an adjudication of guilt…for conduct not part of the instant offense," U.S.S.G. 4A1.2(a)(1), the Sentencing Commission has recognized that after the passage of sufficient time a defendant's prior illegal conduct, for which he has paid his debt

---

[2] The Presentence Report does not provide the date of conviction.

to society, should not serve as a basis to punish him more harshly should he break the law again. As pertinent here, the three-year term of imprisonment imposed by the California court April 4, 2002 may be counted *only* if it falls within either of the two "Applicable Time Periods" set forth in U.S.S.G. 4A1.2(e)(1). The subsection provides:

> (1) Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

The California sentenced was imposed April 4, 2002, which unquestionably pre-dates Mr. Carrillo-Berber's commencement of the offense – July 30, 2018 – by more than fifteen years. Hence, it does not count under the first sentence of 4A1.2(e)(1). The more nettlesome question faced by the parties at the time the plea agreement was entered was whether the April 4, 2002 sentence "resulted in the defendant being incarcerated during any part of such fifteen-year period," *i.e.*, on or after July 30, 2003. The burden of proof falls on the government, and upon further investigation, we think it clear that the government has failed to adduce evidence that Mr. Carrillo-Berber was still in California custody, still incarcerated "as a result" of the California sentence, on July 30, 2003, when the fifteen-year look-back period began. The available evidence strongly suggests that by July 30, 2003, Mr. Carrillo-Berber was no longer incarcerated "as a result" of the California sentence, but rather was in the administrative custody of ICE awaiting deportation

Critically, the Presentence Report confirms that Mr. Carrillo-Berber was deported to Mexico by ICE on September 3, 2003, just a little more than a month later and approximately fourteen years and eleven months prior to his commencement of the instant offense. PSR, at ¶¶33 & 43. He was surely in ICE custody at the time of his deportation and unless ICE officials managed to whisk Mr. Carrillo-Berber from a California prison cell to ICE custody, conduct deportation proceedings, and actually deport him within just about thirty days – and the government bears the burden of proving this -- he must have been released by California to ICE custody prior to July 30, 2003, which is outside the fifteen-year window here. In fact, the PSR suggests Mr. Carrillo-Berber was released to ICE custody as early as February 21, 2002, long before the fifteen-year clock started ticking. *See* PSR, at ¶33.

It is well-settled under 18 U.S.C. 3585(b) that "time spent in ICE custody is considered administrative in nature and not 'official detention'" for purposes of determining whether the defendant is "given credit toward the service of a term of imprisonment." *Greenland v. United States*, 2013 W.L. 6049075 (S.D.N.Y. 2013) (KMW). As it is the government who bears the burden of proof, its failure to adduce evidence that Mr. Carrillo-Berber remained in California custody "as a result" of the state prison sentence past July 30, 2003, means the California sentence does not count in Mr. Carrillo-Berber's criminal history calculations. In similar circumstances, courts have readily concluded that when an individual

Case 1:18-cr-00703-PAC   Document 22   Filed 05/26/20   Page 5 of 11

LAW OFFICES OF
GARY G. BECKER, P.L.L.C.

5

serving a state or federal prison time is taken by ICE into its custody for purposes of deportation, that individual is no longer incarcerated "as a result" of the earlier imposed sentence. *See, e.g., United States v. Flores-Orgaz*, 2017 WL 1018499, No. 16-21 (M.D. FL. 2017)(the fifteen-year-clock in U.S.S.G. 4A1.2(e)(1) begins to run once defendant is released by state authorities to ICE custody for deportation); *Guzman-Mogrovejo v. United States*, 2010 WL 3747885, No. 10-civ. 4123 (E.D.N.Y. 2010)(ICE detention is not part of earlier-imposed sentence); *DeLeon v. Copenhauer*, 2012 WL 5906551, No. 12-976, (E.D. Cal. 2012)("[p]etitioner's detention in immigration custody was not a result of the offense for which his current sentence was imposed, but rather the result of his pending removal from the United States").

Thus, pursuant to U.S.S.G. 4A1.2(e)(1) and (3), the April 4, 2002 sentence does not qualify as a "prior sentence" at all, because: (1) it was imposed longer than fifteen years prior to the commencement of the instant offense, July 30, 2018; and (2) the government has not adduced evidence that Mr. Carrillo-Berber remained in California custody for that offense during any part of such fifteen-year period, *i.e.*, on or after July 30, 2003.

The upshot is that Mr. Carrillo-Berber should be found to have no criminal history points, placing him in Criminal History Category I. With the prior bar to Mr. Carrillo-Berber's eligibility for safety-valve relief removed, Mr. Carrillo-Berber recently made a safety-valve proffer to the government (through counsel) which the government has determined is sufficient under U.S.S.G. §5C1.2(a)(5). Consequently, Mr. Carrillo-Berber's total offense level should be reduced two levels, to a total of 23. In Criminal History Category I, that yields an advisory sentencing range of 46-57 months.

**The Offense Conduct**

The nature of the offense conduct is straightforward. Mr. Carrillo-Berber assented to an offer to make some quick money by picking up a couple of packages in the Bronx and delivering them to a location in Brooklyn. He was a low-level delivery man, a pawn in the machinations of others. The individual who contacted Mr. Carrillo-Berber made clear that he knew where Mr. Carrillo-Berber's family lived in Michoacan, Mexico, and it was in his best interests to go along. Michoacan is also home to two of Mexico's deadliest, rival drug cartels and life there can be very cheap. Following the instructions given him, on July 30, 2018, Mr. Carrillo-Berber traveled to a restaurant in the Bronx, met up with a man who handed him a bag, and returned with it to his apartment in Brooklyn. Believing the bag contained drugs – Mr. Carrillo-Berber did not know the type or quantity, but he assumed incorrectly it was cocaine – he did not bring the bag into the apartment but instead hid it in a trash can outside. On July 31, 2018, again following instructions, Mr. Carrillo-Berber retrieved a small package from the bag containing a sample of heroin and delivered it as instructed to a man in Brooklyn. When attempting to deliver the second, larger package in the bag two days later, Mr. Carrillo-Berber was arrested.

The government has agreed that Mr. Carrillo-Berber was a "minor participant" in the offense conduct. He had no say or interest in the type, quantity, or sales price of the drugs he delivered. He was not paid for his efforts. The applicable base offense level for his conduct – 30 – is attributable solely to the happenstance of his carrying one kilogram of heroin, notwithstanding his lack of knowledge as to the type or quantity of the controlled substance he personally carried. *See United States v. Andino*, 627 F.3d 41 (2d Cir. 2010)(the government need not prove *scienter* as to drug type or quantity when defendant personally participates in the drug transaction underlying the conspiracy). Yet if the drug he carried had instead been cocaine, as he thought, although Mr. Carrillo-Berber's knowledge and intent would be the same, the applicable base offense level would be 24, six levels lower. After adjustment for minor role, acceptance of responsibility, and safety valve relief, his total offense level would be 18, corresponding to an advisory sentencing range of 27-33 months in Criminal History Category I.

Mr. Carrillo-Berber's conduct was serious, but it did not involve firearms, violence, or threats of violence. It was quite limited in its duration and scope. Mr. Carrillo-Berber has, through his post-arrest statements, and in a recent proffer to the government (through counsel) "truthfully provided the Government all information and evidence the defendant has concerning the offense...." U.S.S.G. 5C1.2(a)(5), a prerequisite for safety valve relief. Mr. Carrillo-Berber was, unfortunately, just one more in a long line of persons from the poorest strata of society with little education or guidance who got involved in the bottom rungs of the drug trade.

**Despite the Harsh Conditions of his Confinement Mr. Carrillo-Berber has taken Positive Steps to Rehabilitate Himself**

The aftermath of Mr. Carrillo-Berber's arrest and detention on federal charges in this case has shaken his world in unimaginable ways. He has been locked up for the past twenty-two months in the MDC, cut off entirely from his mother, wife, son, stepson, and siblings in Mexico. Mail service to and from the United States and the towns they live in is sporadic at best. He has no family or friends in the United States to visit him. The only visits Mr. Carrillo-Berber has received have been from undersigned counsel, which themselves have now been suspended for well over two months because of Covid-19.

The conditions of Mr. Carrillo-Berber's confinement have become much harsher since the MDC put measures in place to guard against the spread of Covid-19. Mr. Carrillo-Berber is confined to his cell, designed to hold one person, with another prisoner. Because of the pandemic, he is allowed out of his cell for just three one-hour periods each week to shower, stretch his legs and try to get to the telephone to call home. That is, of the 168 hours in a week, Mr. Carrillo-Berber is confined to his cell for 165 hours. The cell contains an open sink and toilet. It has not been cleaned since the lock-down was put in place; no cleaning supplies or disinfectants of any kind are provided. Mr. Carrillo-Berber and his cellmate do the best they can cleaning their cell with soap or shampoo, if

they are lucky enough to have it. Isolation and fear of infection are the order of the day. During the coldest snap of winter temperatures beginning the last week of January 2019, when the MDC lost power and heat, Mr. Carrillo-Berber endured seven days of darkness, freezing temperatures, no hot water, insufficient blankets, cold food, and a host of other deprivations.

Mr. Carrillo-Berber has remained alone, locked in his cell thousands of miles from his family in Mexico, even as they suffered great losses and traumas. His town of Paracuaro is in the state of Michoacan, the home to two rival Mexican drug cartels, and which is considered one of the most violent regions in Mexico.[3] Kidnappings for ransom and shootings are commonplace – the Secretary of the Interior reported that in 2017 alone, there were 1,277 murders. *Id.* In June 2019, Mr. Carrillo-Berber's then seventeen-year-old stepson was kidnapped and held hostage until the family could scrape together money needed to free him. *See* Letter to the Court from stepson, Eduardo Jossue Zacarias Alvarez. While incarcerated, Mr. Carrillo-Berber lost his only brother, Martin Carrillo, who succumbed to the flu. *See* Letter to the Court from Ines Alvarez Hernandez. A few months later, he lost an aunt he loved very much.

Yet despite all this adversity, Mr. Carrillo-Berber has never complained to undersigned counsel or made excuses for his conduct; he has never blamed anyone but himself for his predicament. In a letter to the Court written before the pandemic lockdown at the MDC, Mr. Carrillo-Berber made clear: "I write to you to express my deepest apologies for my crime…I'm filled with remorse I spend my time here attending church staying away from trouble and making myself a better man." *See* Letter to Court from Mr. Carrillo-Berber. He prays that he can return home to be with his family and pledges: "If I'm given a second chance I will not take it for granted and will never commit a crime." He expressed a willingness to plead guilty right from the start. He always managed a warm smile when joining me in the attorney visiting room at the MDC.

Although the formal opportunities for improvement at the MDC are quite limited, Mr. Carrillo-Berber's participation in self-improvement courses while incarcerated at the MDC, including two American Sign Language Classes (*see* PSR, at ¶57 and attached certificates) is a further testament to Mr. Carrillo-Berber's character and to his sincere desire to resume being a productive, law-abiding member of society. What is more, in the nearly two-years he has spent in the MDC, often living under inhumane conditions with no heat or hot water, he has never been cited for a disciplinary infraction of any kind.

Further, Mr. Carrillo-Berber has been industrious while imprisoned. Unlike most of his fellow prisoners, Mr. Carrillo-Berber cannot rely on his impecunious family members to fund his commissary account. Instead, he offered to clean the cells of his fellow inmates in exchange for some commissary funding. Until the Covid-19 lockdown put an end to that,

---

[3] https://observers.france24.com/en/20180613-mexico-cartels-violence-paracuaro-michoacan

Mr. Carrillo-Berber earned an average of $25 per week cleaning other inmates' cells.

### The Court May Consider the Harsh Conditions of Mr. Carrillo-Berber's Imprisonment while Awaiting Sentencing

In determining the appropriate sentence here, the Court may take into consideration the harshness of the conditions at the MDC discussed above that Mr. Carrillo-Berber has endured during his twenty-two months of confinement. Even prior to *Booker*, the Second Circuit held that presentence conditions of confinement may be an appropriate basis for a variance from the guidelines. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) ("we hold today that presentence confinement conditions may in appropriate cases be a permissible basis for downward departures"). Although the number of sentencing proceedings in this district has been relatively few over the past ten weeks. given the magnitude of deprivations endured by those detained at the MCC and MDC during this unprecedented pandemic, it is not surprising that courts in this district have factored the unduly harsh conditions into the sentencing calculus. *See, e.g., United States v. Morgan*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (imposing sentence at less than half of the low end of stipulated guidelines range based in part on conditions at MDC during pandemic, and condemning awful conditions at both MCC and MDC even prior to current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing length of sentence of otherwise appropriate sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).

In the best of times, pre-trial detention at the MDC is not easy. MDC's track record of protecting its inmates is not good. The MDC's management of the crisis in the winter of 2019 is instructive. For seven straight days beginning January 26, 2019, while New York City was experiencing single digit and even sub-zero temperatures, MDC Brooklyn went without power and heat, and Mr. Carrillo-Berber and fellow inmates were locked down in the darkness and bitter cold.[4] Mr. Carrillo-Berber and his fellow inmates were denied hot food or additional blankets or warm clothing, despite the frigid air inside the facility. Inmates with serious pre-existing physical and mental illnesses allegedly received no care.[5] Even the most basic efforts, such as moving inmates requiring sleep apnea machines to breathe to the available floors with electricity, were not taken. In granting downward sentencing variances in a series of cases after the blackout, the

---

[4] *See* Annie Correal, No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates Are Sick and "Frantic," N.Y. Times (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/nyregion/mdc-brooklyn-jail-heat.html; Complaint, Scott v. Quay, 19-CV-1075 (MKB), ECF No. 1 (E.D.N.Y. Feb. 22, 2019).

[5] *See* Complaint, *Scott v. Quay*, 19-CV-1075 (MKB), ECF No. 1 (E.D.N.Y. Feb. 22, 2019).

LAW OFFICES OF
GARY G. BECKER, L.L.C.

9

Honorable Pamela K. Chen noted that inmates at the MDC were "subjected to very cruel conditions," and that "there was a reluctance of the part of the officials [at MDC Brooklyn] to correct the conditions or even to disclose them timely."[6]Judge Furman reached the same conclusion: "It's pretty clear to me . . . that steps could have been taken, and taken more quickly, to address the problems [at the MDC]. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC."[7]

**As an "Undocumented Alien" Convicted of an Aggravated Felony, Mr. Carrillo-Berber Faces Mandatory Deportation; Any Additional Term of Imprisonment Beyond that Already Served Will Result in a Sentence that is Longer and Harsher than He Would Otherwise Have to Endure**

As an undocumented alien in the United States, Mr. Carrillo-Berber's plea of guilty to a violation of 21 U.S.C. 846, an "aggravated felony" under 8 U.S.C. 1011(a)(43), renders him subject to mandatory deportation following completion of his prison sentence. *See* 8 U.S.C. 1227(a)(2)(iii). The Presentence Report confirms that Mr. Carrillo-Berber has no legal status in the United States and that an ICE detainer has been lodged. *See* PSR at 1-2 and ¶43.

Further, because of Mr. Carrillo-Berber's status as a "deportable alien," Bureau of Prison policies assure that any sentence your Honor imposes beyond the time Mr. Carrillo-Berber has already served will result in a period of incarceration that is harsher and longer than if the identical sentence were imposed on an equally culpable "non-deportable" offender who committed the identical offense. This disparate punishment has nothing to do with Mr. Carrillo-Berbers's offense conduct and warrants mitigation in sentencing under 28 U.S.C. §991(b)(1)(B) and 18 U.S.C. §3553(a)(6).

The adverse collateral consequences of Mr. Carrillo-Berber's conviction will arise by virtue of him being assigned a Public Safety Factor ("PSF") by the Bureau of Prisons after he is sentenced. This designation signifies that because Mr. Carrillo-Berber will be deported his incarceration requires "increased security measures to ensure the protection of society." *See* Federal Bureau of Prisons, Program Statement 5100.08, Chapter 5 (September 2, 2006), available at https://www.bop.gov/policy/progstat/5100_008.pdf. For example, whereas a "non-deportable" offender would be eligible for designation to a minimum security facility;

---

[6] Tr. of Sent. Hearing. at 12, *United States v. Acosta De La Rosa*, 18-CR-667 (PKC), ECF No. 16 (E.D.N.Y.Jun. 4, 2019); *see also United States v. Bruney*, 18-CR-542 (PKC) (E.D.N.Y. 2019); *United States v. Douglas*, 18-CR-554 (PKC) (E.D.N.Y. 2019).

[7] Tr. of Sent. Hearing, at 31, *United States v. Ozols*, No. 16-CR-692 (JMF), ECF No. 234 (S.D.N.Y. Feb. 12, 2019).

would be entitled to spend up to the last 6 months of his sentence in a half-way house; and would be eligible for certain work assignments while incarcerated, Mr. Carrillo-Berber will not. Because an ICE detainer is in place, when Mr. Carrillo-Berber is "released" from prison, he will likely be re-arrested and confined civilly while deportation proceedings are pursued.

Further, when Carrillo-Berber is deported from the United States he will be punished with "a life sentence of banishment [from this country] in addition to the punishment which a citizen would suffer for the identical acts." *Jordan v. DeGeorge*, 341 U.S. 221, 232 (1951)((Jackson, J., dissenting). None of the differences in treatment that Mr. Carrillo-Berber will receive are related in any way to his criminal conduct in this matter. These unwarranted sentencing disparities are anathema to 18 U.S.C. §3553(a)(6)'s mandate that when "determining the particular sentence to be imposed" the Court "shall consider – the need to avoid unwarranted sentence disparities among defendants with similar records who been found guilty of similar conduct." The Court should, therefore, ameliorate these disparities by adjusting downward the sentence it would impose on Mr. Carrillo-Berber if he were not a deportable alien to account for the harsher treatment he will suffer at the hands of the Bureau of Prisons.

### Objections to Presentence Report

¶¶30-35: As discussed above, Mr. Carrillo-Berber should be found to be in Criminal History Category I with zero criminal history points. Because Mr. Carrillo-Berber qualifies for safety valve relief under U.S.S.G. §5C1.2, his total advisory offense level should be reduced two levels, to 23 (not 25 as set forth in paragraph 30).

¶40: Mr. Carrillo-Berber was born October 6, 1978, not 1968.

¶41: Mr. Carrillo-Berber has six (not five) surviving siblings, all of whom are sisters. In addition to being homemakers, most work in the fields picking crops. His brother, Martin Carrillo-Berber succumbed to the flu in 2019, not 2018, when he was 41 years old.

¶54   Mr. Carrillo-Berber's education went only as far as the fourth grade, not the fifth grade.

### Conclusion

Mr. Carrillo-Berber's life has been marked by great adversity and hardships. He certainly did not win the lottery at birth. But I have known Mr. Carrillo-Berber for some time now. He is a respectful, forthright, and likeable individual. He is truly remorseful; his industriousness while incarcerated and spotless disciplinary record confirm the sincerity of his contrition. As demonstrated in his letter to the Court, Mr. Carrillo-Berber wants nothing more than the chance to be reunited with his family, and to nurture and sustain them.

LAW OFFICES OF
GARY G. BECKER, L.L.C.

11

       In view of all the circumstances presented, we respectfully submit that a sentence of time-served, approximately twenty-two months is sufficient in this case.

                                              Respectfully submitted,

                                              Gary G. Becker

Enclosures